UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| STEPHANIE THOM, | ) |
|     Plaintiff | ) ) ) |
| v. | ) Case No. |
| THE UNIVERSITY OF KANSAS SCHOOL OF MEDICINE, and | ) ) ) ) |
| UNIVERSITY OF KANSAS PHYSICIANS, | ) **JURY TRIAL DEMANDED** ) ) |
|     Defendants. | ) |

# COMPLAINT

Plaintiff Dr. Stephanie Thom, by and through counsel, states, alleges, and avers as follows for her Complaint against Defendants, The University of Kansas School of Medicine and University of Kansas Physicians:

## PARTIES

1. Defendant, The University of Kansas School of Medicine, is a governmental agency, or in the alternative is a political subdivision, association, corporation, unincorporated organization or otherwise a "person" as that term is defined in 42 U.S.C. § 2000e, and is an "employer" as that term is defined in 42 U.S.C. § 2000e, with its principal place of business in Wyandotte County, Kansas.

2. Defendant University of Kansas Physicians is a Kansas not for profit corporation, is a "person" as that term is defined in 42 U.S.C. § 2000e, and is an "employer" as that term is defined in 42 U.S.C. § 2000e, with its principal place of business in Wyandotte County, Kansas.

3. Plaintiff Dr. Stephanie Thom (hereinafter, "Dr. Thom") is an individual who was an "employee," as that term is defined in 42 U.S.C. § 2000e, and was jointly employed by Defendants from approximately 2017 until March 2022.

4. All of the acts, conduct, and omissions of Defendants referred to herein were performed by their respective agents, representatives, and employees while in the course and scope of their agency or employment.

## JURISDICTION AND VENUE

5. Jurisdiction is asserted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and 29 U.S.C. § 621 et seq., and 29 U.S.C. § 2601 et seq.

6. This Court has federal question jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C. § 1331, as the acts complained of involve violations of Plaintiff's rights under federal law.

7. The alleged unlawful employment practices took place at Defendant's facilities in Wyandotte County, Kansas.

8. Venue is proper as Defendants' acts of discrimination and wrongdoing occurred in the State of Kansas.

9. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).

## ADMINISTRATIVE PROCEEDINGS

10. Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action. Plaintiff filed timely Charges of Discrimination against Defendants with the Equal Opportunity Employment Commission on December 2, 2022. A copy of the Charge against the University of Kansas School of Medicine (EEOC # 563-2023-01692) is attached hereto and incorporated herein by reference as Exhibit A. A copy of the Charge against University of Kansas Physicians (EEOC # 563-2023-00622) is attached hereto an incorporated herein by reference as Exhibit B. The Charges of Discrimination were filed within 180 days of the most recent incident of discrimination alleged therein.

11. On October 30, 2023, Plaintiff was issued Notices of Right to Sue from the Equal Opportunity Employment commission, authorizing her to proceed with her claims within 90 days thereafter. Copies of these Notices are attached hereto and incorporated herein by reference as Exhibits C and D.

## FACTUAL ALLEGATIONS

12. Dr. Thom was employed in Defendants' Emergency Department physician group as an attending physician.

13. Throughout her employment with the Defendants, until January 2022, Dr. Thom received consistent positive feedback and evaluations, from Emergency Department leadership, from peers, and from resident physicians.

14. On or about January 7, 2022, Dr. Thom received an email from certain members of Emergency Department leadership, including Dr. Chad Cannon ("Dr. Cannon"), the Chair of the Emergency Medicine Department. The email indicated that one or more complaints had been received from resident physicians alleging that she was overly negative, unnecessarily nitpicked their work, and provided residents with feedback that was too lengthy.

15. Dr. Thom was surprised by this email, particularly as it was inconsistent with the prior feedback she had received, including from resident physicians. Dr. Thom replied to the email, and included the then most recent six months' worth of written feedback she had received from resident physicians, which was overwhelmingly positive. Dr. Thom also requested specific examples of her feedback that was considered too negative or too lengthy, but received no response.

16. Dr. Thom was thereafter instructed to attend, and did attend, a videoconference meeting with three members of the Emergency Department's leadership, including Dr. Cannon, on or about January 27, 2022 (the "January 27 meeting").

17. At the January 27 meeting, Dr. Thom was told that while the content of her feedback to resident physicians was not a problem, the "manner and tone" of her feedback, including the "style" and "body language" of her feedback were problematic.

18. No other concerns were raised at the January 27 meeting.  To the contrary, Dr. Thom was reassured that her work performance in all other respects, including the content of her feedback, met or exceeded Defendants' expectations.

19. Defendants declined to provide the names or any other identifying information of the individuals making complaints about Dr. Thom, or provide any documentation of or pertaining to such complaints, at the January 27 meeting or thereafter.  However, two examples of Dr. Thom's alleged shortcomings were described at the January 27 meeting with sufficient detail for Dr. Thom to recognize the circumstances giving rise to the examples.

20. The first of these examples involved a request Dr. Thom made for a urology consult.  The urology resident who was contacted was not physically present and indicated his preference to provide his consult over the phone.  Dr. Thom indicated that in her professional judgment an in-person urology consult was called for.  Upon information and belief, Dr. Thom's expectation that the urology resident conduct an in-person consult was consistent with Defendants' applicable policies and procedures.  Yet even after Dr. Thom made her request clear, the urology resident continued for a time to refuse to agree to conduct an in-person consult.

21. The second example involved certain resident physicians entering patient orders under her name without her prior knowledge or consent.

22. Each of the examples referred to in the January 27 meeting involved resident physicians engaging in improper conduct or insubordination, all in violation of the Defendants' policies and procedures.

23. While the feedback she received in the January 27 meeting was surprising to her and not consistent with the other feedback she had received to that point, Dr. Thom nonetheless accepted the feedback with an open mind and the intention to use it constructively to improve her feedback to residents, even further, going forward. She shared this acceptance and intention with Defendants at the conclusion of the January 27 meeting.

24. Dr. Thom left the January 27 meeting under the impression that her commitment to use the feedback for her continued improvement had resolved the issue for the time being.

25. However, less than an hour after the conclusion of the January 27 meeting, Dr. Thom received an email from one of the meeting attendees indicating that not only were the complaints against her not resolved or even in abeyance, but in fact the complaints were being escalated along not one but four separate paths.

26. Despite the incongruities and despite the escalation of the complaints against her, Dr. Thom made good faith efforts to improve. She sought the assistance of other professionals she considered mentors for help improving her feedback. She reviewed materials, including a video lecture, on the topic. She also sought honest feedback from many of her peers, though none of them identified any concerns or shortcomings.

27. On or about March 4, 2022, Dr. Thom was instructed to and did attend another meeting (the "March 4 meeting") with the same members of Defendants' Emergency Department leadership who had attended the January 27 meeting.

28. At the March 4 meeting, Dr. Thom explained the efforts she had undertaken to improve her feedback and communication.

29. Also at the March 4 meeting, Dr. Thom stated that the multiple escalations of the complaints pertaining to her were unnecessary and unfair given that she had not been provided any opportunity to address the concerns before they were escalated.

30. Finally at the March 4 meeting, Dr. Thom pointed out that Defendants' handbook included a peer review procedure which should have applied to the complaints being made about Dr. Thom but that the review procedure was not being followed.

31. Despite raising these significant issues at the March 4 meeting, no meaningful response was provided to any of these issues at the March 4 meeting or thereafter, and to the best of Dr. Thom's knowledge, each of the issues and concerns she raised at the March 4 meeting were ignored by Defendants.

32. On or about March 10, 2022, Defendants informed Dr. Thom that they had decided not to renew her employment contract and would thereby terminate her employment, further providing her with a deadline by which she could nominally resign in lieu of such termination.

33. Although the Defendants' reactions to the resident feedback complaints and ultimately her termination were the most recent and concrete example of disparate treatment Dr. Thom experienced, they were not the first, but rather were the continuation of an ongoing pattern or practice of such mistreatment.

34. As early as the fall of 2018, Dr. Thom indicated to Dr. Cannon her interest in the position of Clerkship Director.

35. Dr. Thom engaged in a variety of self-study on the subject matter of clerkships and, with the encouragement of Dr. Cannon, attended a lecture series to further position herself

to succeed in a role as Clerkship Director. She further developed a written plan detailing how she would approach and succeed in the position.

36. In April 2019, Dr. Thom presented her written plan and further discussed her interest in the position with Dr. Cannon. At that time, she was informed that a male peer, Dr. Todd Crane, had also expressed interest in the position.

37. Upon information and belief, Dr. Crane possessed no greater qualifications than Dr. Thom for the Clerkship Director position. He also had not engaged in the amount of self-study Dr. Thom had, had not attended a lecture series on the topic as Dr. Thom had, and did not have a written plan or proposal as Dr. Thom did.

38. Dr. Thom met with Dr. Crane to discuss their mutual interest in the Clerkship Director position. Dr. Crane suggested that he should be the Clerkship Director and that Dr. Thom should be the Assistant Clerkship Director. Dr. Thom suggested that instead they could be Co-Directors. No agreement was come to.

39. Dr. Thom thereafter communicated to Defendants, including Dr. Cannon, her continued desire for the Clerkship Director position, and also encouraged the possibility of being Co-Directors with Dr. Crane.

40. A few weeks later, Dr. Cannon informed Dr. Thom that Dr. Crane would be the Clerkship Director and that Dr. Thom would not be a Co-Director, an Assistant Director, or have any other role in the clerkship program. No explanation for the decision was provided, nor was any explanation offered for why Dr. Thom had been encouraged to pursue and study up on the opportunity only to be denied any role in it.

41. Dr. Cannon asked Dr. Thom to "not make a big deal" out of the Clerkship Director denial, and encouraged her to see the "bright side" of the outcome, specifically that she would have more time to plan her then-upcoming wedding.

42. Approximately a year and a half later—after Dr. Crane had left Defendants' employ and at a time when, upon information and belief, no other male expressed interest in the position—Dr. Thom was named Co-Clerkship Director along with another female physician.

43. Defendants are aware, and have been aware, of sexist and misogynistic attitudes, behaviors, and actions by male leaders, including in the Emergency Medicine Department.

44. Upon information and belief, Defendants have specifically arranged the evaluations of certain groups of female employees in such a way so as to avoid them being evaluated by at least one known sexist male leader.

45. Upon information and belief, male physicians are not subjected to complaints about the "style," "tone," or "body language" used when providing feedback to residents, or if they are subject to such complaints they are afforded ample opportunities to correct or improve without their complaints being escalated.

46. Upon information and belief, Defendants have a history and pattern or practice of treating female physicians less favorably, including escalating resident complaints about female attending physicians without first affording an opportunity for improvement.

47. Defendants have issued or caused to be issued one or more gender equity surveys, or other substantially similar surveys of its employees, during the period of Dr. Thom's employment with Defendants.

48. Dr. Thom provided honest and constructive feedback in response to said surveys, including opposing the disparate treatment on the basis of sex which she both experienced and observed.

49. Dr. Thom believed that her responses to the surveys would be anonymous, but, upon information and belief, that anonymity was not maintained and her feedback has fueled motivation among Defendants' leadership to retaliate against Dr. Thom.

## COUNT I – DISCRIMINATION ON THE BASIS OF SEX (TITLE VII)

50. Dr. Thom incorporates by reference the allegations contained in each of the preceding paragraphs of this Complaint.

51. Dr. Thom is female and a member of a protected class under Title VII.

52. Dr. Thom's work performance, at all relevant times, met or exceeded Defendants' legitimate expectations, and Dr. Thom possessed all required credentials and qualifications for the work she was expected to perform for Defendants.

53. Dr. Thom's employment was terminated by Defendants on the basis of sex and in violation of Title VII.

54. Dr. Thom is now suffering and will continue to suffer irreparable injury and damages as a result of Defendants' discriminatory practices unless and until this Court grants relief.

55. As a direct and proximate result of Defendants' actions and/or inactions, Dr. Thom has been deprived of income and other monetary and non-monetary benefits.

56. As a direct and proximate result of Defendants' actions and/or inactions, Dr. Thom has suffered past and future pecuniary losses, humiliation, emotional pain, distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, related compensatory damages, and the additional damages alleged in the preceding paragraphs.

57. Dr. Thom is entitled to recover from Defendants reasonable attorneys' fees, as provided in Section 706(k) of Title VII, 42 U.S.C. § 2000e-5(k).

58. Defendants acted with malice, willfulness, or reckless indifference to the federally protected rights of Dr. Thom.

WHEREFORE, Plaintiff prays for judgment against Defendant on this Count of her Complaint, for a finding that Plaintiff has been subjected to unlawful discrimination prohibited by Title VII, for all actual and compensatory damages, punitive damages for Defendants' conscious wrongdoing, injunctive and declaratory relief, attorneys' fees and costs, and for such other and further relief as the court deems just and proper under the circumstances.

### COUNT II – RETALIATION (TITLE VII)

59. Dr. Thom incorporates by reference the allegations contained in each of the preceding paragraphs of this Complaint.

60. Dr. Thom opposed Defendants' unlawful employment practices including by truthfully reporting sex discrimination she had observed and experienced in response to Defendants' gender equity surveys.

61. Thereafter, Dr. Thom continued to suffer discriminatory and retaliatory acts culminating in the termination of her employment.

62. Dr. Thom's termination was a direct result of her opposition to Defendants' discrimination and retaliation.

63. As a result of Defendants retaliatory actions, Dr. Thom has experienced lost wages, emotional pain and suffering, humiliation, embarrassment, mental anguish, and loss of enjoyment of life.

64. Dr. Thom is entitled to recover from Defendant reasonable attorneys' fees, as provided in Section 706(k) of Title VII, 42 U.S.C. § 2000e-5(k).

65. Defendants acted with malice, willfulness, or reckless indifference to the federally protected rights of Dr. Thom.

WHEREFORE, Plaintiff prays for judgment against Defendant on this Count of her Complaint, for a finding that Plaintiff has been subjected to unlawful retaliation prohibited by Title VII, for all actual and compensatory damages, punitive damages for Defendants' conscious wrongdoing, injunctive and declaratory relief, attorneys' fees and costs, and for such other and further relief as the court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all counts so triable.

Designation of place of trial is Kansas City, Kansas.

KRIGEL & KRIGEL, P.C.

*/s/Lara K. Pabst*
Lara K. Pabst, KS #24454
4520 Main St., Suite 700
Kansas City, Missouri 64111
lpabst@krigelandkrigel.com
Tel No. (816) 756-5800
Fax No. (816) 756-1999